**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| RHONDA ALEY, on behalf of herself and purportedly on behalf of others similarly situated, | : | |
| | : | |
| | : | Civil Action No. 5:22-cv-00330-AMN-TWD |
| Plaintiff, | : | |
| | : | |
| v. | : | Hon. U.S. District Judge Anne M. Nardacci |
| | : | |
| LIGHTFIRE PARTNERS, LLC | : | Hon. Magistrate Judge Thérèse W. Dancks |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

<u>**TABLE OF CONTENTS**</u>

I.    **INTRODUCTION**
II.   **FACTS RELEVANT TO PLAINTIFF'S MOTION** ........................................................ 3

A.    Lightfire Serves Clients as a Contact Center ........................................................ 3

B.    The Website Through Which Connexus Generated Leads ........................................ 4

C.    The Autoprotectors Campaign and Verifications of Express Written Consent ...................... 5

D.    Plaintiff's Claim ........................................................ 6

E.    The Putative Classes in the Complaint and Motion ........................................................ 6

III.  **LEGAL STANDARD** ........................................................ 7

IV.   **PLAINTIFF'S SELF-SERVING STATEMENTS ABOUT BEING AN ADEQUATE
REPRESENTATIVE OF THE PUTATIVE CLASS IGNORE HER HISTORY** ................... 7

A.    Plaintiff Disregarded Her Obligations by Failing to Review Pleadings and Sworn Answers
to Discovery Requests ........................................................ 8

B.    Several Credibility Issues Demonstrate Plaintiff Cannot Serve as an Effective
Representative of the Putative Class ........................................................ 11

C.    Unique Defenses of Consent Will Hinder Plaintiff's Representation of the Class ............. 12

D.    The Assertion that Lightfire Called Plaintiff Despite Her Never Having Visited the Lead
Generating Website Makes Her an Outlier ........................................................ 14

V.    **PLAINTIFF FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(b)(3)
CLASS BECAUSE SHE CANNOT ESTABLISH PREDOMINANCE** ................................... 18

A.    The Prevalence of Individualized Consent Issues Make This Claim Ill-Suited for Class
Treatment ........................................................ 19

B.    None of the Generalized Critiques that Plaintiff Presents on the Legal Sufficiency of the
Users' Express Written Consent Are Persuasive ........................................................ 20

  1.  The protocol that the lead generator Connexus implemented secured ........................... 20

     consent from the consumers who Lightfire contacted. ........................................................ 20

  2.  There is nothing misleading about the myjobscorner.com website ............................... 22

  3.  The theory that Connexus generated bogus leads is baseless. ................................... 22

  4.  Plaintiff's false assertions about the deficiencies in the means of obtaining consent.... 23

C.    There Are No Statutory Mandates to Satisfy E-SIGN Disclosure Requirements in
Procuring Consent ........................................................ 24

D.    Plaintiff's Contention That It Was Necessary to Secure Independent Consent from Her
(and Other Class Members) for Each Promoted Service Provider is Not Well-reasoned. ............. 25

CONCLUSION ........................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Alpha Tech Pet, Inc. v Lagasse, LLC*, No. 16 C 513, 2017 US Dist LEXIS 182499, at *13 (N. Dist. Ill, Nov. 3, 2017) ........................................................................................................ 20

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005)...................... 20

*Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 229 (S.D. Ind. 2006)........................... 16

*Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S. Ct. 1166, 63 L. Ed. 2d 427 (1980). 9

*Fober v. Mgmt. & Tech. Consultants, LLC*, 2016 U.S. Dist. LEXIS 187347, at *9 (C.D. Cal. July 29, 2016).................................................................................................................................. 21

*Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326-27 (5th Cir. 2008................................... 17

*Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 431 (6th Cir. 2012) ............................................ 12

*In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004) ........................................... 18

*In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006)............................... 17

*In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017) ............................................................... 22

*Johnson v. Nextel Communications Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)............................... 17

*Jones v. CBE Group, Inc.*, 215 F.R.D. 558, 568-69 (D. Minn. 2003) ......................................... 12

*Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008) ...................................... 13

*Levitt v.Fax.com*, 2007 U.S. Dist. LEXIS 83143 at *11-13 (D. Md. May 25, 2007).................. 17

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017)......................................................... 21

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ............................................. 18

*Neves v. Nationwide Credit, Inc.*, No. 95-CV-1532, 1996 U.S. Dist. LEXIS 22241, *6 (N.D. Ga. Mar. 20, 1996)............................................................................................................................ 16

*O'Callaghan v. Uber Corp. of Cal.*, 2018 U.S. Dist. LEXIS 112021, at *15 n.9 (S.D.N.Y. July 3, 2018) .......................................................................................................................................... 20

*S & M Homes, LLC v. Chicago Title Ins. Co.*, 2014 WL 12634492, at *11 (W.D. Tenn. Mar. 14, 2014).......................................................................................................................................... 10

*San Pedro-Salcedo v Häagen-Dazs Shoppe Co.*, No. 5:17-cv-03504-EJD, 2019 US Dist LEXIS 208228, at *15 (ND Cal Dec. 3, 2019)...................................................................................... 16

*See Sherman v. Yahoo! Inc.*, No. 13CV0041-GPC-WVG, 2015 WL 5604400, at *8 (Sept. 23, 2015).......................................................................................................................................... 13

*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 310 (N.D. Ohio 2009) .................................. 12

*Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal., 2011).................. 21

*Toney v. Quality Res., Inc.,* 323 F.R.D. 567 (N.D. Ill. 2018) ...................................................... 23

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ............................................... 22

*Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 397 (D.N.J. 1998).................................... 9

## I.    <u>INTRODUCTION</u>

Defendant LightFire Partners, LLC ("Defendant" or "Lightfire") submits this Response in opposition to the pending Motion for Class Certification (Dkt. 68) prior to its filing of a Motion for Summary Judgment on a "safe harbor" defense that precludes the Plaintiff's sole claim for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

Lightfire obtained Plaintiff's telephone number from an advertiser and lead provider, Connexus Digital, Inc. ("Connexus"), pursuant to an agreement that guaranteed every lead would have a confirmation history showing the consumer's express consent to receiving calls by Lightfire. No matter how scrupulous lead generators such as Connexus may be in gathering confirmation of consent, claimants such as Ms. Aley aver the same set of allegations, scarcely tailored to the Defendant: "telemarketers" involved in some inchoate scheme to annoy people. That trope ignores the business that Lightfire conducted in this setting. It receives verified leads from an online marketer and connected those interested consumers with its clients. In the industry, Lightfire is known as a "contact center" and it forbids its agents from placing calls to persons without a verified lead that indicates the recipient welcomes the communication.

The theory of liability for a nationwide class that Plaintiff presents here is simple but misguided.  Lightfire allegedly violated the TCPA by placing calls to telephone numbers it paid to receive, merely because several thousand of those numbers are (predictably, as a statistical matter) registered on the "Do-Not-Call" Registry. If, as a matter of law, the TCPA prohibited contact centers from placing calls to consumers with DNC-registered numbers, a few practical consequences would have come to pass that have not. Registering a number on the DNC registry would be a momentous act, precluding a substantial amount of marketing contact by telephone (even if it was desired). In addition, the industry would be excused from staying abreast of the

latest developments in TCPA regulations because the bright-line rule of never contacting DNC-registered numbers would prevail.

*First*, the issue of whether each DNC-registered call recipient provided express consent to receive the calls at issue is the fulcrum of TCPA liability and defeats class certification here. There is no question that individualized issues surround the issue of consent, some of which are manifest in the contested allegations that comprise Plaintiff's claim. While Plaintiff tries to avoid those complexities by mounting several attacks on the opt-in paths that every lead culled from visitors to the "MyJobsCorner" website necessarily followed, those critiques are superficial and, in some instances, misstate the facts.

*Second,* even if Plaintiff could identify predominate common issues, she is a grossly inadequate class representative and therefore cannot satisfy the requirements of Fed. R. Civ. P. 23(a), or 23(b)(3). The admissions that Plaintiff made during her deposition regarding her utter failure to review both verified answers to interrogatories and allegations in the Complaint for accuracy undermine her credibility. Her ignorance was consequential because, among other misstatements, Plaintiff falsely alleged and attested that she instructed Lightfire to cease contacting her. Her cavalier approach to her responsibilities in discovery reinforce she is not suited to serve as a class representative.

*Third*, if the Court trusted Plaintiff to pivot and excused her history of swearing out false statements and allegations, her claims are subject to unique defenses on grounds of consent and she is not a typical claimant in the putative class. That is, even if the factfinder accepted the curious claim that Plaintiff did not visit the website through which Lightfire received leads, she seeking to represent persons who did visit the website and have nothing in common with her.

Despite Plaintiff's best efforts to sensationalize this matter by making empty assertions about cybercrime and misleading business practices, the reality is that the lead generation that Connexus performed was conscientious and TCPA-complaint. Predictably, as Plaintiff acknowledges, there are no other "actions against [Lightfire] alleging TCPA violations…" (*See* Dkt. No. 68-1, p. 20) (the "Cert. Mtn."). The only inappropriate matter that Plaintiff alleges with respect to the calls she received was Lightfire disregarding her request to be left alone. She now admits that did not happen. The uncontroverted facts in this dispute reflect that it does not belong in the category of cases where courts certify a "Do-Not-Call" class asserting a TCPA violation, *i.e.* bad actors placing calls without any indicia of consent. Instead, it is a vanilla by-the-book series of calls to a professional litigant who cannot reconcile the pervasive individualized issues of consent with the requirements of Fed. R. Civ. P. 23. Accordingly, the Court should deny this motion and leave Plaintiff to pursue her suspect individual claim.

## II.    FACTS RELEVANT TO PLAINTIFF'S MOTION

### A.  Lightfire Serves Clients as a Contact Center

As relevant here, Lightfire served as a contact center exclusively following on consumer leads that it acquired from a separate party, Connexus. (**Ex. A**, Griffin Dep. Tr., 10:19-11:10, 14:5-9). Its CEO, Michael Griffin, testified that it "operate[s] as an entity in which we're calling on data that has TCPA opt-in as opposed to cold lists. We are not a telemarketing company, we are a contact center. So we are contacting individuals that have requested to be called by us for products or services." (*Id.* at 15:4-9).

In furtherance of that model, Lightfire and Connexus entered into an agreement whereby Connexus would deliver leads to Lightfire; the agreement required that Connexus would obtain TCPA-compliant express consent that "contain[ed] all of the elements set forth in 47 CFR §64.1200(f)(8) which specifically includes the name of the Party(ies) on whose behalf a

3

Consenting Consumer may be called and/or, where applicable, contacted via SMS messaging."
(**Ex. B**, Declaration of Michael Griffin ("Griffin Decl.") at ¶ 9-10; *see also* **Ex. C**, Declaration of
Alberto Moreas ("Moreas Decl.") at ¶ 6.))

Upon a client's request, Connexus has the ability to obtain information from a third-party
that utilizes technology to track the origin and history of a lead event and the consumer's actions
that occurred at that event, documenting the specific disclosures and consent(s) obtained to verify
compliance with the TCPA. (*See* Ex. C, Moraes Decl. at ¶7, attaching lead reports at Ex. 1).

Thus, in placing calls in connection with this "MyJobsCorner" / "Autoprotectors" digital
marketing campaign, Lightfire *did not* offer to provide services of its own or contact anyone
whose contact information was not retrievable through the collection of leads that Connexus
provided Lightfire. No facts adduced in discovery indicate that Lightfire scrapped online data or
public records to obtain contact information about consumers. The contact with Plaintiff was not
made at random, but instead was made only after someone registered Plaintiff's telephone
number on a website that Connexus maintained. (Ex. B at ¶ 16-21, 27; Ex. C at ¶¶ 5, 11-16).

### B. The Website Through Which Connexus Generated Leads

When consumers visit one of the websites that Connexus maintains, here the
"Myjobscorner.com" website, the protocol is to assign a unique visitor ID to that user in real time
and then contemporaneously stores several pieces of information, including certain information
voluntarily provided by the user such as their telephone number. (Ex. B at ¶ 10). Once the
consumer provides the contact information, the website displays a page seeking the consumer's
"prior express written consent" within the meaning of 47 CFR Sec. 64.1200(f)(8) and the TCPA.
(*Id*. at ¶ 16; Ex. C at ¶ 11.) The user must check an unchecked check box and then click a
continue button, which to Lightfire's understanding constitutes an electronic signature under The
Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"). (Ex. B at ¶ 17;

Ex. C at ¶ 12.) If the user checks the box and clicks continue, a recording of the date/timestamp of the TCPA Consent is archived. (*Id*.)

### C.  The Autoprotectors Campaign and Verifications of Express Written Consent

Based on the archived data, Connexus obtained an opt-in from Plaintiff (or, at a minimum, a person inputting Plaintiff's contact information). (Ex. C at ¶ 13). Plaintiff's first apparent instance of prior express written consent requesting to be called occurred on January 24, 2022, by agreeing to this disclosure:

> I agree to be contacted by phone and/or receive daily recurring sms text messages (messages and data rates may apply) by myjobscorner, citizens disability, national disability, rocket jobs, hustlyy and marketing partners at the phone number provided (including my wireless), whether or not the number is the federal or state do not call registry. I acknowledge that these calls or sms messages may be made using an autodialer and may also contain pre-recorded messages. For sms message campaigns: text stop to stop and help for help. Msg & data rates may apply. I understand my consent is not required to perform a job search, or to purchase or use any goods or services offered. To receive this information without providing this consent, skip here.

(Ex. B at ¶ 18; Ex. C at ¶ 13-14). While continuing to use the website www.myjobscorner.com, Plaintiff (or the visitor using her contact information) would have been presented with a popup window offering the possibility of lowering her car insurance with similar opt-in language. (Ex. B at ¶¶ 20-21; Ex. C at ¶¶ 15-16). That disclosure included a dynamic insertion of the telephone number the consumer provided within the disclosure. (Ex. B at ¶ 21; Ex. C at ¶ 16). Lightfire followed a standard procedure for the Autoprotectors campaign to send interested consumers a link via text or email during the phone call to walk them through an online lead funnel that would then identifies the appropriate carrier for the consumer. (*See* Ex. B at ¶ 25). During that live call with a Lightfire representative, the consumer would be prompted to click on the carrier result they found most attractive, routing them to a separate website that the carrier maintains. (*Id.*) If interested, the consumer would then complete the carrier's intake form to receive a quote and would be afforded the chance to initiate that engagement themselves. (*Id.* at ¶¶ 25, 26).

In addition to retrieving the lead data for the contact with Plaintiff, the IT team at Connexus queried its database regarding the consent information obtained for six other randomly selected visitors who provided lead information to Connexus and, in turn, Lightfire. (Ex. B at ¶ 28; Ex. C at ¶¶ 17, 29). Lightfire then confirmed that its calling records traced to the registration information those users and found no indicia of any fraud, *i.e.* no reporting from those users that they had not consented to receive the calls. provided by the users and/or collected by Connexus by reason of the query Griffin requested. (Ex. B at ¶¶ 28, 29). As there is no public database of cell phone subscribers or a reverse-cellular telephone number lookup provider that can reliably provide subscriber information, neither Connexus nor other lead providers have the capacity to determine whether each user has entered a name that matches the subscriber name for a given telephone number. (Ex. B at ¶ 30; Ex. C at ¶ 30.)

### D.  **Plaintiff's Claim**

On April 7, 2022, without making a pre-litigation demand, Plaintiff filed a boilerplate Complaint alleging that Lightfire violated the TCPA because it allegedly placed multiple telephone calls to Plaintiff without her prior express written consent after Plaintiff registered her residential number on the Do-Not-Call Registry. (*See* Dkt. 1 ("Compl.")). Plaintiff has not adduced any proof to support her allegations that she "never provided her consent or requested these calls" and "asked the Defendant to no longer call." (*Id.* at ¶ 29, 35).

### E.  **The Putative Classes in the Complaint and Motion**

In her Complaint seeking to certify a nationwide class, Plaintiff defined the proposed class as: "All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing calls from or on behalf of Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint." (*Id.* at ¶ 39.) Without seeking leave to amend her Complaint, Plaintiff now

seeks to certify a different class: "All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from Lightfire as part of the "Auto Protectors" calling campaign (3) within a 12-month period, (4) as evidenced in the calling data Lightfire produced in this lawsuit, (5) from four years prior the filing of the Complaint." Plaintiff raised this definition for the first time in this action in her motion for class certification. (*See* the Cert. Mtn., p. 4). This new class definition, like the class definition contained in her Complaint, fails to identify a certifiable class.

## III.    LEGAL STANDARD

Plaintiff bears the burden of showing that: (i) each of the four requirements of Rule 23(a) is satisfied; and (ii) at least one of the requirements of Rule 23(b) is met. *See* Fed. R. Civ. P. 23. Courts often consider whether the claimant satisfies these requirements collectively, given the relatedness of the inquiries concerning commonality, typicality and adequacy. "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Court must engage in a "rigorous analysis," that involves evaluating "the merits of the plaintiff's underlying claim," before determining whether the certification prerequisites are met. *Id.* To certify a class, a district court must definitively assess each class certification element and find that each requirement is "established by at least a preponderance of the evidence." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

## IV.    PLAINTIFF'S SELF-SERVING STATEMENTS ABOUT BEING AN ADEQUATE REPRESENTATIVE OF THE PUTATIVE CLASS IGNORE HER HISTORY

Like many class representatives, Ms. Aley is a figurehead who needs to rely on her counsel to formulate claims and argue the law. However, both she and her counsel have a responsibility to ensure that she remains engaged in the litigation to serve as an effective fiduciary to the class. Plaintiff's deposition testimony confirmed they are abdicating that

responsibility. Plaintiff consistently executes documents without bothering to read them, *i.e.* from first agreeing to serve as a representative in the spring of 2022 (without reviewing the engagement letter) to signing interrogatory answers in late 2023 that she ignored. Plaintiff not only admits blindly signing but also acknowledges ***making false allegations and swearing out false statements*** on key issues in the litigation, *e.g.* giving Lightfire a verbal instruction to cease contacting her. While her devil-may-care candor on these subjects is appreciated, Plaintiff is little more than a rubber stamp for her attorneys.

**A.** **Plaintiff Disregarded Her Obligations by Failing to Review Pleadings and Sworn Answers to Discovery Requests**

Were the Court to certify a class with Ms. Aley as the representative, it would hazard her continuing her demonstrable history of disrespecting for the judicial process. Plaintiff made several, specific admissions that she executed key documents, one of them an attestation of interrogatory answers, without so much as reading them:

(i)  She never reviewed the engagement letter that described her responsibilities as a class representative and could not identify any of the obligations delineated in the agreement (**Exhibit D**, Aley Dep. Tr., 43:3-23, 41:19-42:5, 45:13-19);

(ii)  She neither reviewed the Complaint filed on her behalf nor verified the accuracy of the allegations (*id.* at 52:16-22, 54:24-55:1, 73:8-23);

(iii)  She does not know or recall answering the interrogatories propounded to her at any time (*id.* at 61:22 – 62:14, 124:24 – 125:23);

(iv)  She verified the interrogatory answers but did not read them, answering ***"right" when asked "so you verified it, but didn't read through it?"*** (*id.* at 65:9-24); and,

(v)  She had not seen the production requests Lightfire propounded to her prior to her deposition and did nothing other than pulling her telephone records from Verizon to retrieve documents in connection with the case. (*id.* at 98:24 – 99:24).

This is not a case of defense counsel nitpicking about excusable errors or technical oversights. Rather, Plaintiff acknowledged several instances of signing or authorizing the filing of

documents without bothering to review them. Her self-serving attestation that, to date, she has "stayed in contact with my counsel about the case and responded to written discovery requests when they requested them of me" (*see* Aley Decl., Dkt. 68-6, ¶ 16) after admitting her failure to verify *any* of the critical matters in the Complaint and interrogatory answers rings especially hollow. At a minimum, Plaintiff and her counsel should have outlined a plan to begin fulfilling their duties prospectively while acknowledging the missteps to date. Instead, they double down with a false narrative about the propriety of prior indefensible conduct.

A class representative has a fiduciary duty to the class, "and as a result the certified representatives may not take any action which will prejudice the Class's interest, or further their personal interests at the expense of the Class." *Martens v. Thomann*, 273 F.3d 159, 173 n.10 (2d. Cir. 2001) (cleaned up).  The representative plaintiff owes a fiduciary duty to absent members even before the class is certified. *Dabit v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 375 BR 719, 727 (SDNY 2007); *citing Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S. Ct. 1166 (1980). "Problems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative." *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 397 (D. N.J. 1998). The arguably sanctionable conduct that has occurred already is prone to repetition if the Court were to certify the class with Ms. Aley as a representative.

In fact discovery, Lightfire produced business records establishing the means by which it acquired Plaintiff's contact information, seemingly inconsistent with the allegations and interrogatory answers from Plaintiff in which she denied knowing how the personal information came to be entered on the website. (*See, e.g.,* Compl. at ¶ 19). Yet, Plaintiff admitted under oath that she never searched her browsing history for the information that Lightfire sought in

9

discovery. Namely, Plaintiff did nothing to assess whether she may have provided her contact information online that was then, in turn, given to LightFire. (Ex. D, Aley Dep. Tr., 128:3-9).

She further admitted that she may have deleted that browsing history. The only means by which Plaintiff accessed the internet was through a Samsung personal device that she used consistently in January and February of 2022.  (*Id.* at 20:5-20). Plaintiff did not know if she had deleted her browsing history on the device in the 23 months since receiving the calls from Lightfire but acknowledged she may have. (*Id.*) Thus, Plaintiff's ignorance of how Lightfire obtained her contact information is likely a result of her shirking her responsibility to investigate her own background, where information about her giving of consent would have resided. Plaintiff's deposition confirmed other signifiers of her indifference to her role in litigation:

- Plaintiff had no recollection of reviewing the accuracy of the claims recently filed on her behalf in the U.S. District Court for the Northern District of Illinois (before being dismissed) assigned case no. 1:2022-cv-04543 (*Id.* at 106:24 - 107:20); and,

- She also could not recall if her attorneys named the correct defendant in that action because she did not know if the defendant Eligo Energy, LLC even placed calls to her—it asserted that it did not. (*Id.* at 112:24 – 113:1-14).

Plaintiffs who are indifferent to or disengaged from the lawsuit do not satisfy the adequacy test. *See, e.g., S & M Homes, LLC v. Chicago Title Ins. Co.*, 2014 WL 12634492, at *11 (W.D. Tenn. Mar. 14, 2014) (plaintiff who showed "some indifference as a class representative" was inadequate); *see Davidson v Citizens Gas & Coke Utility*, 238 FRD 225, 232 (SD Ind, 2006) (criticizing the lack of diligence by counsel that did not consult with a class representative to review documentation and stating "we surmise that counsel simply mailed these forms to [plaintiff] with instructions to sign them which he did, with his wife's assistance…[t]he result was that [plaintiff] likely perjured himself.")  Similarly, Aley effectively confessed that she committed perjury during her deposition. First, she executed the sworn statement attesting that

the interrogatory answers were "true and correct" when she admittedly did not review them.

(**Exhibit E**, Plaintiff's sworn interrogatory answers, p. 9.) Second, she also admitted that some of

substantive answers given (*e.g.* the answer to interrogatory 13 that she "told the caller on

February 1, 2022 not to call anymore…") were false. (*See id.*, p. 6; compare to Ex. D, 65:9-24).

Her blithe signing of a statement "made under penalty of perjury" impugns her credibility and, as

in *Davidson*, that misconduct should result in a denial of certification.

**B.    Several Credibility Issues Demonstrate Plaintiff Cannot Serve as an Effective Representative of the Putative Class.**

Although Plaintiff alleges she did not want to receive the calls and notified Lightfire that

she should not be contacted (Compl., Dkt. 1 at ¶ 29), she now admits those allegations (and the

related interrogatory answers she verified) are false. Plaintiff initially testified in her deposition

that she informed Lightfire that she wanted to be left alone (Ex. D, Aley Dep. Tr., 68:4-7) and

was confident about the accuracy of that allegation in paragraph 29 of the Complaint (*id.* at

69:24 – 70:3) before recanting that testimony when counsel played recordings of the calls back.

(*id.* at 88:9 – 89:3). Plaintiff acknowledged that her allegation that she asked Lightfire to stop

calling was either "patently false" or was unsupported by any facts (*id.* at 94:4-16).

Moreover, at the time Plaintiff filed the Complaint, she had no knowledge of the goods

and services that LightFire may have been engaged to provide.  (*Id.* at 56:15 – 57:14). Therefore,

Plaintiff conceded that she was not positioned to make the authoritative allegation in paragraph

19 of the Complaint that she never sought out or solicited information regarding Defendant's

goods and services prior to receiving the calls at issue. (*Id.*)   Aley also cannot say whether she

ever entered her email address or phone number online for purposes of obtaining marketing

information or product information.  (*Id.* at 121:24 - 123:3). Plaintiff was uncertain about her

assertions that she did not enter information on the Myjobscorner website and stated that she recalled seeking out a babysitting employment opportunity online. (*Id.* at 129:10-15, 130:2-12).

The truth is the transcripts of the two calls Plaintiff answered from Lightfire – consuming a total of 61 seconds of her time – established she neither complained nor opted-out before commencing this action. To determine whether a class representative can adequately fulfill his responsibilities, "courts may consider [his] honesty and trustworthiness." *Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 431 (6th Cir. 2012). "The honesty and credibility of a class representative is relevant" to adequacy because "an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 310 (N.D. Ohio 2009); *see also Jones v. CBE Group, Inc.*, 215 F.R.D. 558, 568-69 (D. Minn. 2003) (finding that the adequacy requirement was not met where the named plaintiff was, among other things, "confused about the action" and "unfamiliar with his own complaint, his claims and the parties involved."). Here, Plaintiff's lack of credibility, combined with her carelessness in evaluating and asserting the claims, renders her an inadequate representative.

**C.**  **Unique Defenses of Consent Will Hinder Plaintiff's Representation of the Class**

Challenging the merits of Plaintiff's claim will involve scrutiny of her assertions about not visiting the website and the circumstances surrounding the entry and receipt of her personal information. Plaintiff has no explanation as to why someone with nothing to gain by providing the contact information would do so, *i.e.* there is no motivation to be an imposter in this context. Plaintiff could not identify any reason a disinterested party would provide her personal information through a website and does not know if it happened. (Ex. D, Aley Dep. Tr. at 128:10-21). Again, Plaintiff's claims are quite vulnerable because she did not trace her own browsing history to see if

she had visited the websites at issue and has no way of knowing if she entered any information on a website in the relevant period. (*id.* at 120:12-19, 128:22-129:1).

The issue of unique defenses is "routinely consider[ed] . . . under the typicality, commonality, and/or the adequacy prongs of Rule 23(a)." *Med. Socy. of NY v UnitedHealth Group Inc.*, 332 FRD 138, 150 (SDNY 2019); *citing Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008). At the class certification stage, the defendant "need not show . . . that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Id.* Courts have repeatedly found that unique questions regarding consent in TCPA cases preclude class treatment because the named plaintiff is not an adequate and typical class representative in such cases. *See Sherman v. Yahoo! Inc.*, No. 13CV0041-GPC-WVG, 2015 WL 5604400, at *8 (Sept. 23, 2015) (unique issues regarding the plaintiff's alleged consent precluded a finding that he was an adequate or typical class representative); *Wiley v Am. Fin. Network, Inc.*, Case No. 22-00244, 2023 US Dist LEXIS 127293, at *10 (C.D. Cal July 3, 2023) (denying class certification because "Plaintiff's unique circumstances could also deter her from vigorously prosecuting all class members' claims" regardless of the truth of the assertions on consent.)

In *Wiley*, the defendant purchased leads with UniqueID numbers that verified the expression of consent in loan products the caller, a mortgage banker, had to offer. *Wiley*, 2023 US Dist LEXIS 127293, at *2. Although the defendant did not have a recording of the calls, as here, the Court denied the certification motion, reasoning "even if, as she alleges, Plaintiff did not ask Defendant to contact her, Defendant will understandably spend substantial time at trial eliciting testimony and arguing that she did, likely to the class's detriment." *Id.* Plaintiff now occupies a much less favorable pre-certification position than the claimants found wanting in

13

*Sherman* and *Wiley*. Although she has now signed off on a Complaint, interrogatory answers and a declaration prepared in connection with this motion regarding the disconnect between her and the marketing website, the truth of that assertion is, most charitably, questionable. What Plaintiff knew about the marketing campaign and her connectedness with the other class claimants remains, most favorably, uncertain. *Sapan v Veritas Funding, LLC,* No. SACV 23-00468-CJC, 2023 US Dist LEXIS 180373, at *12-13 [CD Cal July 28, 2023) (denying class certification after determining that a "plausible way to read his Complaint and interpret the evidence is that he invited Defendant to communicate with him" despite alleging that he did not consent, in part because he did not "affirmatively [tell] [d]efendant not to call him.") In *Sapan*, the court observed that the context of the communications between the claimant and defendant made "…class certification inappropriate whether or not it is actually true that Plaintiff's words and conduct invited further calls from Defendant." *Id*.

### D. The Assertion that Lightfire Called Plaintiff Despite Her Never Having Visited the Lead Generating Website Makes Her an Outlier

Plaintiff predictably raises red flags around the consent path within the site that Connexus administered, characterizing it as presenting visitors with "misleading" questions and asserting "infirmities" such as burying the consent notice and obscuring the "manner of opting out." (*See* Cert. Mot., Dkt. 68, p. 10). However, Plaintiff's counsel acknowledges "there are likely to be consent issues in this case" but then asserts in a conclusory fashion that Plaintiff's "personal experience is not atypical of other class members *whose purported consent rely on the same website*." (Cert. Mot., Dkt. 68, p. 14). This makes no sense.

Plaintiff denies ever having visited the Connexus-affiliated website in question. If her most recent version of events is assumed true (*i.e.* she never visited the website) she is not positioned to represent a putative class of individuals who did. That is, she is unqualified to

14

advance the claims that Connexus failed to gather contact data in a TCPA-compliant manner because, unlike the putative class, she asserts she did not experience the layers of opt-in disclosures. Also, it is undisputed that during the two telephone calls involving a Lightfire agent and Plaintiff, she did not advance to the stage of receiving an in-call opt-in text for the Autoprotectors campaign. (*Compare* Ex. B, ¶¶ 24, 25 with the Complaint.) Plaintiff knows nothing about that redundant layer of obtaining consent, so that stage of the opt-in is predictably absent from her Complaint. Plaintiff has not basis for questioning the means by which Connexus and Lightfire gathered data and secured express consent clicking through the opt-ins.[1]

Plaintiff erroneously spot-cites *Berman* at p. 972 in support of her position on typicality when that part of the opinion addresses objections to an expert report.  In *Berman*, the district court ***denied*** class certification finding the claimant did not satisfy the typicality requirement for precisely the same reasons Lightfire articulates here:

> Defendants' proof of its affirmative defense of express consent would be the same for Berman as for any other putative class member in some respects. However, Berman (and perhaps other members of the class not yet identified) would counter that affirmative defense with evidence that they never visited a Fluent website. While Berman's claims are "reasonably coextensive" with class members' claims, litigation of the express consent and mandatory arbitration defenses applicable to absent class members threatens to overwhelm other issues in the litigation.

*Berman v Freedom Fin Network, LLC*, 400 F Supp 3d 964, 987 (ND Cal, 2019). Thus, far from supporting class certification of a DNC class with a named representative who disclaims consent, the court in *Berman* "concludes that Berman has not sufficiently demonstrated his typicality and

---

[1] Plaintiff also does not identify anyone similarly situated to her, *i.e.* a person who Lightfire contacted in connection with the Autoprotectors campaign who claims not to have visited the website. While the offhand arguments Plaintiff makes about "bogus" leads suggest that other such individuals may exist, the expert report does not include opinions about some subset of the class categorically not inviting the calls.

adequacy with respect to the class as currently defined." *Id.* at 987. Mr. Paronich was counsel of record for the defeated plaintiff there and should know better than to misstate this holding.

The other authority Plaintiff cites on this point does not contravene her position like *Berman* but are of little help. In *Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 626 (S.D. Cal. 2015), the ruling makes no reference to the issue of consent that is so critical here. That case involved thousands of persons who received faxes and prerecorded voice messages. Relatedly, *Meyer* affirmed a ruling granting provisional class certification and turned on a discrete issue of the defendant having called debtors with a particular debt in violation of FCC regulations with no showing of consent. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (stating the defendant "did not show a single instance where express was given before the call was placed.") The claims against the defendants in *NCSPlus* and *Papa John's* were both susceptible to class treatment because the defendants had behaved irresponsibly and had no evidence to marshal on consent. *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) (the defendant argued consent could be implied and had "no policies or procedures for determining…whether the recipients of its autodialed calls have provided prior express consent to receive such calls."); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 569 (W.D. Wash. 2012) (citing evidence from multiple persons that they did not provide consent and finding there was "no evidence in the record that any customer who received messages sent [by the vendor] gave such consent.") Those cases plainly have no bearing on this one.

Unlike the extreme cases where masses of people receive calls without the caller showing how the connections were made, Plaintiff now asserts an exotic claim. That is, she acknowledges Lightfire has a traceable process by which it obtained her information, but alleges that data was inexplicably gathered (insofar as she denies visiting the Connexus-affiliated website.) In the

*Sherman* case cited *supra*, the district court observed that "class members who voluntarily provided their phone number to [the defendant] prior to receiving the Welcome Message may be found to have consented, whereas Plaintiff (who provided hers after receiving the Welcome Message) would not.

This alleged issue of Lightfire not securing consent for contact from the service providers that supported the Autoprotectors offering also reveals the inadequacy of Plaintiff as a representative. After Lightfire engaged with a lead during a call, its standard approach was to send a written invitation to the interested party *during the call* inviting them to, again, opt-in to further contact from an insurance carrier. (Ex. B, Griffin Decl., ¶¶ 25-27).[2] Plaintiff is not aware of that practice because her abbreviated communications with the agents did not progress to that point. However, that means of consent that other members of the putative class would need to be determined on a case-by-case basis.

These distinctions put Plaintiff in a position of having interests that are not typical of the entire class and, thus, being preoccupied with unique defenses. *Sherman*, 2015 US Dist LEXIS 127809, at *32. Lightfire can imagine extraordinary scenarios in which a lead might be deemed ineffective for some reason but those would be the uncommon exception, not the rule.[3] What emerged from the pleadings and fact discovery is that Plaintiff alleged her class claims for

---

[2] Even if the *Noviello v. Holloway Funding Grp*., 2023 U.S. Dist. LEXIS 3060, *15 (N.D. Tex. Jan. 9, 2023 ) case stood for the proposition for which Plaintiff cites it – that 47 C.F.R. 64.1200(c)(ii) requires a listing of the ultimate seller (Lightfire cannot glean that holding from the opinion) – it is immaterial.

[3] There is no reason to think Connexus provided unusual leads with information provided by persons other than the cellular phone subscriber, but it would not necessarily invalidate the consent. Rather, the person who gives TCPA consent to be contacted may be a non-subscriber customary user included in the calling plan at the relevant time, in addition to the subscriber. In the Matter of Rules and Regs. Implementing the Tel. Consumer Protection Act, 30 FCC Rcd. 7961, 8000-01¶¶ 73-75 (2015); *see Jacobs v. Quicken Loans, Inc.*, 2017 U.S. Dist. LEXIS 176469, at *10 (S.D. Fla. Oct. 19, 2017) (holding "consent could be given by someone other than the subscriber, such as a third-party affiliate, or spouse…")

rampant violations of the TCPA with no understanding of the business that Lightfire conducts. The denial of class certification is therefore proper "if the named plaintiff's participation is so minimal that the plaintiff has virtually abdicated to his or her attorney the conduct of the case…" *Neves v. Nationwide Credit, Inc.*, No. 95-CV-1532, 1996 U.S. Dist. LEXIS 22241, *6 (N.D. Ga. Mar. 20, 1996). In sum, Aley is a grossly inadequate fiduciary because she is neither informed about the claims nor shows an inclination to dedicate attention to the process.

## V.    PLAINTIFF FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(b)(3) CLASS BECAUSE SHE CANNOT ESTABLISH PREDOMINANCE

Even if Plaintiff managed to satisfy the commonality requirement of Rule 23(a), "the predominance criterion is far more demanding." *Johnson v. Nextel Communications Inc.*, 780 F.3d 128, 138 (2d Cir. 2015). "In order to meet the predominance requirement a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006). The court "must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson*, 780 F.3d at 138.

Courts routinely deny certification of putative classes on the basis that proof of consent is an essential individual issue under the TCPA that makes class treatment inappropriate. *See, e.g. Hicks v Client Servs.*, No. 07-61822, 2008 US Dist LEXIS 101129, at *19 (SD Fla Dec. 10, 2008) (rejecting certification for a lack of commonality and predominance and stating that "[w]hether the burden is on the Plaintiff or the Defendant [to produce evidence of consent], ultimately consent is an issue that would have to be determined on an individual basis at trial.");

*Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326-27 (5th Cir. 2008); *Levitt v.Fax.com,* 2007 U.S. Dist. LEXIS 83143 at *11-13 (D. Md. May 25, 2007) (ruling against class certification while noting the *lack* of evidence regarding consent). Plaintiff hypothesizes that the Court can resolve the confounding consent issues on a class-wide basis in several unpersuasive ways.

A.  **The Prevalence of Individualized Consent Issues Make This Claim Ill-Suited for Class Treatment**

Although Lightfire may need to satisfy its burden of proof to establish its affirmative defense of consent "issues of liability and issues of predominance are not the same. Individualized issues necessary to decide an affirmative defense may predominate so as to prevent class certification." *Jamison v First Credit Servs*, ___F Supp 3d___; 2013 U.S. Dist. LEXIS 105352, at *22-23 (ND Ill., July 29, 2013); *citing In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004) (stating "predominance of individual issues necessary to decide an affirmative defense may preclude class certification"); *also citing BioPay*, 541 F3d at  329 (noting "we do not perceive in [plaintiff's] arguments any other sensible method of establishing consent or the lack thereof via class-wide proof."); *cited with approval Lackawanna Chiropractic PC v Tivity Health Support,* 2021 U.S. Dist. LEXIS 179201,*4 (WDNY, Sep. 20, 2021).

Plaintiff attempts to sidestep the vexing problem of consent by asserting that "…the Plaintiff's class definition and work done in discovery ***completely avoids*** such [consent] issues." (*See* Cert. Mot., p. 18, Dkt. 63) (*emphasis supplied*). This is a problem at the certification stage because Plaintiff must persuade the Court that it will not be forced to conduct a separate merits inquiry into whether each call was transmitted to each putative class member with or without permission. The reality is that if this class were certified the Court will be forced to conduct a separate merits inquiry into whether the putative class members to whom Lightfire placed each call provided consent for the calls.  If deciding the claims of a class will eventually devolve into

19

a "series of mini-trials," a putative class action cannot satisfy the requirements of Rule 23, and the class may not be certified. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). Plaintiff errs in neglecting to make an affirmative showing that consent will not predominate because conclusory assertions regarding the affirmative defense of consent are insufficient.

Instead, Plaintiff asserted the most generalized allegations of a lack of consent imaginable: essentially reiterating the elements of Rule 23(c) and relying on an expert report to show the telephone numbers that Lightfire dialed happened to be on the Do-Not-Call Registry. That does not work in terms of identifying persons who might possess a claim entitling them to recourse. "A plaintiff may not turn a lawsuit into a class action simply by designating it as a class action in the pleadings." 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.80(1) (3d ed. 2017). The argument that Mr. Woolfson's "expert" report is not rebutted is of no significance because that report merely traces the calls placed to DNC-registrants. The incidence of those calls is not presently a subject of dispute. Rather, as described in a ruling denying class certification in a TCPA fax case "[r]egardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation." *Sandusky Wellness Ctr., LLC v ASD Specialty Healthcare, Inc.*, 863 F3d 460, 468 (6th Cir 2017). This cannot be reconciled with Rule 23(b)(3)'s predominance requirements, because "the predominant issue of fact is undoubtedly one of *individual* consent." *BioPay,* 541 F.3d at 318.

**B.  <u>None of the Generalized Critiques that Plaintiff Presents on the Legal Sufficiency of the Users' Express Written Consent Are Persuasive</u>**

1.  <u>Connexus implemented a protocol for the lead generation that appeared to secure consent from the persons Lightfire contacted.</u>

The consent protocol that Connexus followed in tracking the consumers who visited the www.myjobscorner.com website and the associated records that Lightfire produced establish, at

a minimum, that a significant portion of the putative class granted consent prior to Lightfire placing the calls at issue. Lightfire recently retrieved background information for the consent given by six randomly selected persons who it called in connection with the Autoprotectors campaign. (Ex. B, Griffin Decl. at ¶¶ 28, 29.) For these six individuals, the Connexus records reflect that each individual registered and provided TCPA consent. (*Id.*). Plaintiff will have no competent basis upon which one might conclude these registrations are contrived in some way.

Any rebuttal that Connexus's logging of personal information does not reveal the actual incidence of those persons providing written consent would be speculative and counter-productive for Plaintiff. The TCPA requires only that an individual provide their cellphone number and "prior express written consent." Connexus requested additional information (including names and other contact information) for business purposes, but the TCPA does not require Connexus to collect such information or provide that consent is not present if a consumer failed to provide accurate information.

Relevant here, "defendants do not need to show that *all* potential class members were consenting customers to demonstrate that consent is an individualized issue." *Alpha Tech Pet, Inc. v Lagasse, LLC*, No. 16 C 513, 2017 US Dist LEXIS 182499, at *13 (N. Dist. Ill, Nov. 3, 2017) (rejecting class claims); *see also Brodsky v Humanadental Ins. Co.*, 269 F Supp 3d 841, 846 (N. Dist. Ill. 2017) (stating "[w]here Defendants set forth 'specific evidence showing that a significant percentage of the putative class consented' to the communication at issue, 'courts have found that issues of individualized consent predominate [over] any common questions of law or fact.'") (cleaned up). The disclosures on the myjobscorner.com website align with other websites that courts have deemed acceptable in terms of obtaining assent to terms. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (stating "[c]ourts routinely uphold clickwrap

21

agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"); *see also Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal., 2011).

2. <u>There is nothing misleading about the myjobscorner.com website</u>

Plaintiff makes a few passing attacks at the MyJobsCorner website as one imbued with "fraudulent intent" because it "seemingly" offers "legitimate job opportunities" but is a "ploy" to gain contact information for marketing purposes. This is all undeveloped rhetoric, *i.e.* the legitimacy of the employment offerings available through the website was never probed much less discredited. It is illegitimate to contend that the disclosures on the website at issue may be fairly compared to the websites examined in *Arnaud* and *Applebaum*. *See Arnaud v. Doctor's Assocs.*, 821 Fed. Appx. 54, 56-57 (2nd Cir. 2020) (holding the consent terms were not conspicuous because the link was smallish and "introduced by no language other than the shorthand "T & Cs.'"); *see also Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017) (stating "Lyft's registration process, as it existed when the plaintiff accessed it in April 2016, did not alert reasonable consumers to the gravity of the 'clicks,' namely, that clicking the Box and then the pink 'Next' bar at the bottom of the screen constituted acceptance of a contract, including an arbitration agreement, governing the parties' obligations going forward.") Comparing the disclosures in those cases to the disclosures here lacks credibility.

3. <u>The theory that Connexus generated bogus leads is baseless.</u>

Without any factual basis, Plaintiff states that Lightfire is using a "NetNut residential callback proxy network" and suggests that such use is "exclusively used by businesses to hide the fact that they are using a proxy to visit a particular website and to obtain a precise, targeted residential IP in a specific geographic location." (*See* Cert. Mtn., Dkt. 68-1, p. 13).   Plaintiff

further suggests that proxy networks are "massively abused for hiding cybercrime activity…" *Id*. In making these assertions, Plaintiff cites a dead archive link (https://archive.is/vydwz) and a link to spur.us. However, the result for the IP address retrievable from the spur.us webpage reflects an the opposite of Plaintiff's characterization, indicating "174.197.206.227 itself does not appear to be part of anonymization infrastructure." *See*  https://spur.us/context/174.197.206.227 (last visited March 22, 2024). That same webpage further states that that IP address 174.197.206.227 I "…is owned by Verizon Business and is hosted in Syracuse, US. This IP belongs to MOBILE infrastructure. Mobile gateways like this can service small areas or entire regions depending on the service provider." Further, the IP address has a geo radius that includes Verona, Syracuse and Albany, the same area in which Plaintiff resides.[4] Thus, Plaintiff's entire discussion of the sinister ways that cyber criminals may use proxy networks is immaterial and distracting.[5]

4.  <u>Plaintiff's false assertions about the deficiencies in the means of obtaining consent.</u>

Here, Plaintiff does not aver much less provide a factual basis for a coherent challenge to the sufficiency of consent on a class-wide basis. It is simply untrue that a common question exists because the same evidence will not "suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized class-wide proof.'" *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017); quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

---

[4] https://www.maxmind.com/en/geoip-web-services-demo (last visited February 19, 2024).
[5] Even if a proxy service had been employed, there is nothing inherently suspect about using a proxy service. Lightfire notes that the IP address for the United States District Court Northen District of New York's website is 199.107.16.181. Running that IP address through the same spur.us search Aley used, reveals that the nynd.uscourts.gov's IP is using a proxy service, FROXY_PROXY. FROXY_PROXY is a Residential and Mobile proxy provider based out of Estonia." The Court presumably is not engaged in any nefarious activity and the suggestion that using a proxy server is necessarily problematic is wrong.

(2016)). Although Plaintiff takes several hyperbolic shots at the adequacy of the consent that Connexus secured, none of those challenges withstand scrutiny.

### C. There Are No Statutory Mandates to Satisfy E-SIGN Disclosure Requirements in Procuring Consent

The argument Plaintiff asserts with respect to the completed website forms not satisfying certain disclosure requirements of the E-SIGN Act is meritless. The relevant regulatory framework here concerns the means of gathering signatures on consent forms, *not* the disclosure requirements to which Plaintiff refers. 47 CFR § 64.1200(9)(ii) defines "signature" for express written consent purposes: "[t]he term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law." Relatedly, the FCC has concluded "[c]onsistent with the FTC…that obtain prior express written consent using any medium or format permitted by the E-Sign Act," may be used, including "email, *website form*, text message, telephone keypress, or voice recording." *Morris v Modernize, Inc*, ___F Supp 3d___; 2018 U.S. Dist. LEXIS 232701, at *5-6 (WD Tex, Sep. 27, 2018) (*emphasis supplied*); *citing In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (Feb. 15, 2012). Courts regularly recognize that when a website visitor checks a box that constitutes electronic written signature sufficient to confer consent. *O'Callaghan v. Uber Corp. of Cal.*, 2018 U.S. Dist. LEXIS 112021, at *15 n.9 (S.D.N.Y. July 3, 2018) (holding that by clicking "YES, I AGREE" the plaintiff "electronically signed the operative agreements"); *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005) ("Signing an acknowledgment or, in a more modern context, clicking a box on a computer screen, are acts associated with entering into contracts."). Again, Plaintiff is advancing overreaching theories that do not avoid the effect of the written consent forms upon which Lightfire acted.

**D.  Plaintiff's Contention That It Was Necessary to Secure Independent Consent from Her for Each Promoted Service Provider is Not Well-reasoned.**

Plaintiff's reliance on *Toney v. Quality Res., Inc.,* 323 F.R.D. 567 (N.D. Ill. 2018) is misplaced because the indication of consent in that case bears no resemblance to the opt-ins present here. The expression of consent at issue in *Toney* was a single sentence contained within a privacy policy on defendant's webpage stating "the information we collect is used to communicate with you about your product orders and shared with other organizations to help them contact consumers by e-mail and/or telephone for marketing purposes." *Toney,* 323 F.R.D. at 573. By contrast, the layered consent disclosures that Plaintiff assembles at Exhibit 4 to its Motion unequivocally afford the website visitor the option to click Yes or No, in prominent boxes. (*See* Cert Mot., Ex. 4 thereto, LFP 000002, *see also* Ex. B, Griffin Decl., ¶¶ 16-22).

Affirmative action is required to agree to the offer to receive contact from Autoprotectors in that the visitor is presented with the Lightfire consent statement and then may, but does not have to, click "YES" to consent. In addition, for persons who engage with the Lightfire representative about the Autoprotectors offering are provided a link via text or email during the call to "walk them through an online lead funnel that then identifies the appropriate carrier for the consumer. During the call, the consumer clicks on the carrier result they find most attractive and that click routes them to a separate website that the carrier maintains. The consumer then completes the carrier's intake form..." (Ex. D, Griffin Decl., ¶ 25). Plaintiff has no knowledge of this individualized intake because she terminated the two calls answered. Dissimilarly, in *Toney,* the mere use of the defendant's website(s) "signif[ied] that you have read, understand and agree to be bound by this Privacy Policy." *Toney,* 323 F.R.D. at 573.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's Motion for Class Certification.

25

Respectfully submitted,

LIGHTFIRE PARTNERS, LLC

By: */s/ John Fitzpatrick*
John Fitzpatrick (ARDC #6277475)
Cunningham Dalman PC
321 Settlers Road
Holland, MI 49423
(616) 392-1821
jfitzpatrick@cunninghamdalman.com

*One of its attorneys*